IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 22-cr-00324-NYW

UNITED STATES OF AMERICA,

      Plaintiff,

v.

EDWARD BAKER HARRINGTON,
    *a/k/a E. Baker Harrington,*
    *a/k/a Edward Baker Harrington, II,*
    *a/k/a Baker Harrington,*

      Defendant.

---

## MOTION FOR NON-GUIDELINE SENTENCE AND SENTENCING STATEMENT

---

In April 2020, Ed Harrington was a desperate man. The COVID-19 pandemic that struck the nation the month prior had devastated millions of businesses in the United States (and around the world), and Mr. Harrington was no different. Emerging out of a series of financial crises the previous two years, Mr. Harrington was dependent on income from his corporate executive search business and had no savings to fall back on. Amidst all-but-certain business failure and a crumbling marriage, Mr. Harrington applied for federal loans through the Small Business Administration (SBA)'s Paycheck Protection Program (PPP) – a program designed to keep businesses afloat during the pandemic. Except: Mr. Harrington wasn't eligible for these loans, because he is a convicted felon; he exaggerated his needs and lied in an effort to receive loan approval. In his mind, his businesses were the kind that should qualify for relief, but for his recent history. However, his exaggerations and falsehoods resulted in granted loans that he was not entitled to, and he used the proceeds of those loans to support his family and attempt to revive his dying

marriage. Ultimately, he was charged and now has entered a plea of guilty to Wire Fraud and Money Laundering. Doc. 25. At 59 years old, Mr. Harrington knows that incarceration, the first of his life, lies ahead.

At his sentencing hearing on July 14, 2023, Mr. Harrington will request that the court impose a sentencing of twelve months and one day of imprisonment, followed by three years of supervised release. This sentence is appropriate for this case, this harm, and this man.

## Procedural History

On October 18, 2022, Mr. Harrington was indicted on eight counts of Wire Fraud (in violation of 18 U.S.C. § 1343), and five counts of Money Laundering (in violation of 18 U.S.C. § 1957). Doc. 1. Mr. Harrington was released on conditions; he resides in Idaho Springs, Colorado and has been compliant with all terms of his pretrial release.

On March 23, 2023, Mr. Harrington entered a plea of guilty to one count of Wire Fraud and one count of Money Laundering. Docs. 24, 25. Sentencing is set for July 14, 2023 at 1:00 p.m.

## Who Is Edward Harrington?

Edward Harrington was born in South Carolina in 1963 to loving parents and a stable upbringing. His father was in the military; Ed was raised in an upper-middle-class environment largely sheltered from the ills of the world. He was well-educated, acquiring both bachelor's and master's degrees from the University of South Carolina. He married his wife Angela at age 29 and had two children in the subsequent few years. In short: until his late forties, Ed Harrington had a life path that was traditional, particularly for a well-off young man raised in the Southern United States; his path was paved by loving parents, traditional conservative upbringing, ample resources, and few crises.

However, like many picture-perfect lives, the reality was more difficult than the perception. After over 15 years together, Mr. Harrington and his wife were in a marriage that had grown cold and stale. In 2010, he met Tonya, a colleague at work. While the relationship was platonic at first, the two soon fell deeply in love and made plans to leave their respective spouses. This was life-altering for Ed – and not simply because of the ending of his marriage, but that leaving his marriage for another relationship represented a moral failure for him and was opposite of the socially conservative values of his upbringing. The only justification was the deep, all-consuming love he felt for Tonya, whom he viewed as his forever soulmate. He agreed to a divorce settlement with Angela and, for years, paid her over $5000 a month for alimony and child support.

Ed and Tonya were married in late 2011, and Ed became a step-father to her two children. This time was a happy one for Ed; he worked in human resources and thrived, working as a contractor for the Department of Defense, traveling to Afghanistan and all over the country for work. In 2015, he, Tonya, and the children moved to Colorado as Ed started working for a Denver-based company. The job was demanding; he frequently worked long hours and his requests to be compensated for the extra time went unanswered. It was then that he made a bad decision to fix a bad situation: he took matters into his own hands. As an employee in human resources, he simply changed his compensation to adjust for what he felt was owed. Ultimately he was caught; in 2018 he pleaded guilty to felony Theft in Denver County Court, and was ordered to pay around $17,000 in restitution. Doc. 25 at ¶ 51. As a first offender with no previous arrests in his history, he received a deferred sentence. *Id.*

Determined to begin anew, Mr. Harrington and his family moved to Big Sky, Montana. He started several companies that contracted with corporations to assist with executive job placement – essentially, he was a headhunter for corporate leadership jobs. He was good at it, and would

3

receive payment from his client companies based on the salary and start date of the position he was able to fill. His family was renting a house in Big Sky, he continued to pay both alimony and child support to Angela to the tune of thousands per month, and he owed restitution for his Denver case, so his net cash flow was very tight. In 2019, his largest client suspended outside corporate hiring. That same year, his family had to suddenly move, twice in a five-month-span when their rental houses were converted to short-term rental properties. In the competitive real estate market of Big Sky, Ed paid huge sums to find housing for his family on short notice. And, in the fall 2019, when a large placement delayed their employment start date by several months – leaving Ed anticipating, but not yet in receipt of, over $30,000 he desperately needed to pay his bills – Ed turned to check kiting to cover expenses. While he eventually was paid and could cover the costs, it was too late - in late 2019, he was charged with felony Theft out of Montana. He was ultimately convicted, and given a suspended sentence.

By early 2020, Ed's marriage to Tonya was falling apart. After two years of difficult financial positions, court involvement, and housing instability, he was terrified that his soulmate would leave and was determined to do anything he could to keep her in a stable lifestyle. The devastating effect on him cannot be overstated: he had left his family to be with his now-wife, and failure was simply not an option for him – he was determined to do anything to protect Tonya from his financial dire straits. When the pandemic hit in March 2020, his main client once again suspended outside hiring, and his income stream dried up. When the federal government began offering small business relief loans, they seemed like an answer to his prayers – until he realized that his prior convictions disqualified him.

From April 2020 through January 2021, Ed Harrington applied for multiple PPP loans using his late sister's social security number and exaggerating the needs of his businesses to

4

optimize the money available. In total, he received just over one million dollars over ten months. He used the money to live: he paid his biological kids' college tuition, paid for housing and food for his wife and her family, and gave gifts to his wife to save his crumbling marriage.

In the end, none of it worked. Tonya left and took her children. Ed's biological children distanced themselves from him, and the money dried up. In October of 2022, he was indicted for the charges of this instant case. As of the date of this filing, Ed Harrington is 59 years old and alone. He has been diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder. See Doc. 27 at ¶ 70. He is indigent, single, with no family support, and a likely prison sentence impending. This is Ed Harrington's rock bottom.

## Position of the Parties

Both Mr. Harrington and the Government agree that the total offense level is 23 and Mr. Harrington's criminal history category is III, resulting in an advisory sentencing guideline range of 57 to 71 months. Pursuant to the Plea Agreement, Mr. Harrington expects the Government to request a sentence of 57 months of imprisonment, the bottom of the applicable guideline range. Doc. 25 at 3.

In the initial disclosure of the Presentence Investigation Report (PSR, Doc. 27), the United States Probation Officer (USPO) calculated the total offense level to be 25, by including as loss a $43,000 loan application that the parties agree should not be counted.[1] As a result, the PSR erroneously calculates the advisory sentencing guideline range to be 70-87 months. Doc. 27 at R-1. Presumably using that incorrect guideline range as a starting point, the USPO is recommending a sentence of 60 months of imprisonment.

---

[1] Both Mr. Harrington and the Government have filed objections to the inclusion of that application (and the subsequent higher loss calculation). *See* Docs. 28, 29.

5

<u>12 Months + 1 Day is the Appropriate Sentence Here</u>

18 U.S.C. § 3553(a)(2) requires the Court to consider the need for the sentence imposed:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) To afford adequate deterrence to criminal conduct;
(C) To protect the public from further crimes of the defendant; and
(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner…

Mr. Harrington agrees that incarceration is appropriate here. He is not a first-time offender; he has been given opportunities for non-custodial supervision but his poor decisions in times of crisis have continued. But a sentence of nearly five years is greater than necessary to accomplish the goals of sentencing. First, Mr. Harrington is subject to an outdated guideline enhancement that doesn't codify the harm in this case. Second, as a person with literally no jail or prison experience, the requested sentence will severely punish him and deter him from future crimes. And, concerns about deterrence can be best addressed within the limitations (and supports) of supervised release, not through extended incarceration. For these reasons, the Court should impose a sentence of twelve months plus one day of imprisonment, with supervised release to follow.

***The enhancement under §2B1.1(b)(17) applies, but is not warranted here.***

The parties agree that Mr. Harrington receives a 2-point increase in his offense level because he derived more than $1 million in gross receipts from one or more financial institutions, pursuant to U.S.S.G. §2B1.1(b)(17). However, the Court should consider varying to account for that enhancement, because Mr. Harrington did not create the underlying harm it was intended to punish and deter.

An examination of the history of this enhancement demonstrates that its application to Mr. Harrington is not justified. In 1989, Congress ordered the Sentencing Commission to promulgate guidelines, or amend existing guidelines, "to provide for a substantial period of incarceration" for

6

law violations that "substantially jeopardize[] the safety and soundness of a federally insured financial institution." Financial Institutions Reform, Recovery, and Enforcement Act of 1989, § 961(m). Accordingly, in 1990, the Commission amended the theft and fraud guidelines to add to each a +4 enhancement "if the offense substantially jeopardized the safety and soundness of a financial institution." U.S.S.G. Amend No. 317 (Nov. 1, 1990). That same year, Congress passed the Crime Control Act of 1990, and instructed the Sentencing Commission to assign an offense level no less than 24 if the defendant affects a financial institution and "derives more than $1,000,000 in gross receipts from the offense." Crime Control Act of 1990, §2507(a). The Commission did so in the 1991 Guideline Manual:

> (7) If the offense --
>
>   (A) substantially jeopardized the safety and soundness of a financial institution; or
>
>   (B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense,
>
> increase by 4 levels. If the resulting offense level is less than level 24, increase to level 24.

U.S.S.G. §2B1.1(b)(7) (1991). The resulting language was in place for ten years, until in 2001, the Sentencing Commission substantially amended the Guidelines in a six-part "Economic Crime Package". U.S.S.G. Amend. 617 (Nov. 1, 2001). This amendment, among many other things, raised the majority of the specific offense characteristic increases for loss and lowered the enhancement for deriving more than $1 million from an offense that affected a financial institution from +4 to +2, citing the new increases in loss enhancements. The Commission stated "elimination of the enhancement entirely would not provide an appropriate punishment for those offenders involved with losses that are in the $1,000,000 to $2,500,000 range of loss," essentially shifting

7

the enhancement away from the originally intended effect on financial institutions and creating a duplicative enhancement for amount of loss that is not codified in the loss table. *Id.*

Mr. Harrington is now subject to an enhancement whose origins date back over thirty years – and whose benchmark is outdated. According to the Bureau of Labor Statistics, the value of $1,000,000 in 1991 is the equivalent of over *twice* that amount today – over $2.2 million.[2] If this enhancement is meant to quantify harm in terms of the value of the receipts received, then Mr. Harrington doesn't meet the requirements: one million dollars today is worth less than half of what its value was in 1991. Further, the 2001 amendments by the Sentencing Commission appear to be a way to tack on additional offense level increases for loss, rather than codify any effect on the financial institution. Here, Mr. Harrington had far less than a million dollars' worth of effect on any one financial institution, as his loans were through eight different banks and ranged in amount from $20,832 to $149,000. Doc. 25 at 10. This outdated, illogical enhancement is one reason why the Court should impose a sentence beneath the advisory guideline range.

### *The sentencing factors of 18 U.S.C. § 3553(a) support a 12 month + 1 day sentence.*

The Sentencing Guidelines are an important and required consideration in sentencing, but they frequently offer an imperfect measurement of harm - particularly in fraud-related cases. The Guidelines treat the amount of loss as the sole indicium of seriousness, but the true need for retribution "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, Excessive Prison Sentences,

---

[2] This data was calculated using the Inflation Calculator on the Bureau of Labor Statistics website, comparing November 1991 to May 2023 (the latest month with data available) : https://data.bls.gov/cgi-bin/cpicalc.pl (last accessed on June 29, 2023).

Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005).

Here, the victim of Mr. Harrington's fraud is the Small Business Administration (SBA). While Mr. Harrington received taxpayer money he was not entitled to, it is important to note that the SBA does not have the vulnerabilities of an individual victim, or a retirement fund, or investors. The SBA has regulatory and statutory tools to not only recover debt, but collect it with interest and penalties that increase as time passes. In this sense, the seriousness of the harm created by this crime is much less than traditional fraud against individual victims.

Further mitigating Mr. Harrington's situation are his current life and family circumstances. To be blunt: Mr. Harrington has no one. He has limited contact with his college-age children, who largely sided with their mother in the ugly 2011 divorce. His recent ex-wife, an unwitting beneficiary of the money Mr. Harrington received from the PPP loan proceeds, no longer speaks to him. Both of his parents and his sister are deceased. Mr. Harrington lives alone. He has no assets to speak of, no close friends, and no family support.

Certainly, some of these circumstances are the result of Mr. Harrington's own conduct. But for him, this isolation is rock-bottom of his life. Now facing a significant prison term, he has no plan for support while incarcerated: he has no one with whom to leave his few belongings or car, no one to call, no one to put money on his books, and no one to be a welcome friendly face upon his release. This isolation means that Mr. Harrington's time in custody will be difficult in a way distinctive from those who have frequent family and further compounds his mental health issues, including anxiety, depression, and sleeplessness.

Finally, Mr. Harrington acknowledges that being a repeat financial crime offender may raise concerns about deterrence. However, Mr. Harrington's prior convictions resulted in non-

custodial sentences; here, acknowledging his past, Mr. Harrington is both requesting and expecting to spend time in incarceration, a significant (and life-altering) increase in the degree of punishment. He will be subjected to strict conditions on supervised release to prevent future crimes, including a search condition, close monitoring of his finances, and supervision of any business enterprises. The near-inevitability of additional prison time should he violate accomplishes deterrence in a way that additional prison cannot.

Ultimately, Congress requires this Court to impose the lowest sentence necessary to punish, deter, protect the public, and provide correctional treatment. Here, a sentence of twelve months and one day accomplishes those goals; additional prison time serves <u>only</u> to punish and is greater than necessary.

## Conclusion

Edward Harrington is now at the lowest point of his 59 years. He knows he has made poor decisions, but has accepted responsibility for his actions and is prepared for a term of incarceration to account for his crimes. At his upcoming sentencing hearing, he respectfully requests that the Court impose a sentence of twelve months and one day of imprisonment, with three years of supervised release to follow.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Mary V. Butterton
MARY V. BUTTERTON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Mary_Butterton@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

  I hereby certify that on June 30, 2023, I filed the foregoing *Motion for Non-Guideline Sentence and Sentencing Statement* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Martha A. Paluch, Assistant United States Attorney
Email:  Martha.paluch@usdoj.gov

Nicole C. Cassidy, Assistant United States Attorney
Email: Nicole.Cassidy@usdoj.gov

  I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Edward Baker Harrington (via U.S. mail)

             s/ Mary V. Butterton
             MARY V. BUTTERTON
             Assistant Federal Public Defender
             633 17th Street, Suite 1000
             Denver, CO  80202
             Telephone:  (303) 294-7002
             FAX:  (303) 294-1192
             Mary_Butterton@fd.org
             Attorney for Defendant