```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 21-cr-165-RM-1
 3
    UNITED STATES OF AMERICA,
 4
        Plaintiff,
 5
    vs.
 6
    RUSSELL FOREMAN,
 7
        Defendant.
 8   _____

 9                    REPORTER'S TRANSCRIPT
                       SENTENCING HEARING
10   _____

11         Proceedings before the HONORABLE RAYMOND MOORE, Judge,

12   United States District Court for the District of Colorado,

13   occurring at 2 p.m., on the 12th day of August, 2022, in

14   Courtroom A601, United States Courthouse, Denver, Colorado.

15                       APPEARANCES

16         ROBERT BROWN, Assistant U.S. Attorney, 1225 17th

17   Street, Suite 700, Denver, Colorado, 80202, appearing for the

18   Government.

19         MARY BUTTERTON, Assistant Federal Public Defender, 633

20   17th Street, 10th Floor, Denver, Colorado, 80202, appearing for

21   the Defendant.

22

23       TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
                901 19th Street, Denver, Colorado 80294
24       Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer
25
```

```
 1              P R O C E E D I N G S

 2        (In open court at 1:54 p.m.)

 3              THE COURT:  Please be seated.

 4              THE COURT:  Got hemorrhoids, Mr. Brown?

 5              MR. BROWN:  No, just easier to stand up.

 6              THE COURT:  All right.  We're here, 21-cr-165, United

 7    States versus Russell Foreman.  We're here for sentencing.

 8    Take appearances, please.

 9              MR. BROWN:  Your Honor, Robert Brown, for the United

10    States, with me is Jared Erwin from the IRS in case we need

11    some factual --

12              THE COURT:  Good afternoon to you, and good afternoon

13    to him, as well.

14              MS. BUTTERTON:  Good afternoon, Your Honor.

15    Mary Butterton on behalf of Mr. Foreman.  Mr. Foreman is here

16    on bond and joins me at counsel table.

17              THE COURT:  Good afternoon to you, and good afternoon

18    to Mr. Foreman, as well.  So, we're here today for sentencing,

19    following the defendant's earlier plea of guilty to Wire Fraud.

20              Before proceeding to sentencing, at this time I

21    formally accept the plea -- well, let me say, there was also a

22    Money Laundering count, I believe, as well; is that right?

23              MR. BROWN:  Yes, Your Honor.

24              THE COURT:   I formally accept the Plea Agreement,

25    pursuant to which the pleas of guilty were made.
```

1   Ms. Butterton, I know the answer, nonetheless, have you

2   received a copy of the report and the addenda and had

3   sufficient time to go over it with your client?

4           *MS. BUTTERTON:*  I have, Your Honor.

5           *THE COURT:*  Same true for the government?

6           *MR. BROWN:*  Yes Your Honor.

7           *THE COURT:*  All right.  What I understand to have been

8   filed is a little tricky, in this case, so let me see if I can

9   cover everything correctly.

10          I'm going to start with the government.  The

11  government filed a Motion For The Third Point For Acceptance Of

12  Responsibility, that's **ECF Number 65**; that's granted.  The

13  government filed a Motion To Dismiss The Remaining Counts Of

14  The Indictment, other than the Counts pled to that pertain to

15  Mr. Foreman; that's **ECF Number 64**; that motion is granted.  The

16  government filed a Motion For A Preliminary Order Of Forfeiture

17  And Personal Money Judgment, I have already granted and issued

18  the order -- preliminary order of forfeiture at **ECF Number 63.**

19          There's something that we do need to talk about, a

20  little bit later down the road; and that is, that the

21  Preliminary Order Of Forfeiture does not line up exactly with

22  the Plea Agreement, there's did not additional, like, $36 that

23  came from some account, and we will talk about that later, just

24  to make sure that the record is clean.

25          The government filed, then, a Response to

1   Mr. Foreman's objections to the presentence report, as well as

2   a Response to his Motion For Variant Sentence.  Those,

3   respectively, are **ECF Number 51** and **58**.  And then lastly, the

4   government filed a Notice Regarding Loss Amount Of Intended

5   Loss; that is a matter that I will come back to.

6           The defendant filed Objection And Response To The

7   Presentence Investigation Report, and a Motion For A

8   Non-Guideline Sentence.  Built into into the Motion For

9   Non-Guideline Sentence an -- what I will call -- an objection

10  to an anticipated position that isn't really all that hard to

11  anticipate, that has to do with guidelines and whether or not

12  we're talking about actual loss or intended loss.

13          The only other thing that was filed was something that

14  neither party filed, but I decided to file it, just so that we

15  have a record of everything; and that is, and I don't have the

16  ECF Number in front of me, but it's a spreadsheet that I was

17  provided by the probation department that shows various ...

18  loans that were applied for by this defendant.

19          Have I missed anything that the government has filed?

20          *MR. BROWN:*  I don't believe so, Your Honor.

21          *THE COURT:*  Ms. Butterton, how about for you?

22          *MS. BUTTERTON:*  I don't think so, Your Honor.

23          *THE COURT:*  All right.  I'm not seeing it being filed.

24          *MS. BUTTERTON:*  **ECF 60** is what the Court filed the

25  other day.

1    THE COURT:  Okay.  And I simply ... I'm just taking a

2  quick look at it, to make sure it's exactly what I think it is.

3  Yeah.  All right.

4    So, let me note, at the outset, that there were no

5  factual objections to the Presentence Investigation Report.

6  There were no objections filed by either side as to ... any of

7  the guideline calculations in the Presentence Report.

8    There were objections filed as to various special

9  conditions of supervised release, and I will get to those, but,

10  am I correct, so far, in terms of the government's position?

11    MR. BROWN:  Yes, Your Honor.

12    THE COURT:  And the defendant's position?  In terms of

13  what was filed?

14    MS. BUTTERTON:  Yes, Your Honor.

15    THE COURT:  All right.  So, what I'm going to do is,

16  at this juncture, state that I adopt the factual findings in

17  the Presentence Report as supplemented by the spreadsheet, and

18  the additional information I will refer to, momentarily, as my

19  findings of fact concerning sentencing.

20    I want to make -- and, Ms. Butterton, just start

21  keeping a running tab on the things that you need to say, but I

22  want to just, kind of, talk through what the issue is, because

23  I'm raising my -- on my own, an objection to the guideline

24  calculation that's contained in the Presentence Report.  And to

25  be clear, the only thing that I'm quarreling with is the loss

1   amount, and to be more clear than that, what I'm quarreling

2   with is the fact that at paragraph fifty ... no, paragraph 60

3   under Guideline Section 2B1.2(b)(1)(G), there was an increase

4   of 12 levels because the loss was more than $250,000, but less

5   than 500,000.

6          So what is my issue here?  In order to understand

7   this, you have to understand that I have had a prior case, that

8   each side is aware of, where the defendant's name was

9   *Stonebarger*, I believe that's his name, and in that case, what

10  happened was that the government took the position, as it did

11  in this case, that was computing loss based on actual loss and

12  amount of loans that were actually funded where the defendant

13  got the money.  The probation department, in that case, took a

14  different position, and the probation department said, *No.*

15  *Loss is a greater of intended loss, or actual loss*, and the

16  probation department went through various applications and

17  identified particular ones that they believed should be

18  included in the loss calculation.  I agreed with that, and when

19  we came to sentencing, I -- I should say that, basically, my

20  view as -- in terms of the parties, was simply, *Why is this not*

21  *correct?  Why shouldn't I be looking at this*?  Because, the

22  guideline clearly says, *It's the greater of intended or actual*.

23          I will say that some things that probation originally

24  identified, that they were going to include, they did not

25  include at the end of the day, because, for example, there was

1  an explanation given that certain loans or applications were

2  abandoned, and that he was -- the defendant was given the

3  opportunity to come in and sign for them and he didn't sign the

4  loans or the applications, something along that line.

5          In other instances, the government, essentially, said,

6  *Yeah, on that one you are probably right, but we've already*

7  *committed ourselves to actual*.  So, I come to sentencing, in

8  that case, and I say, *Why am I using actual, when intended loss*

9  *seems to be the right number*?

10         What I was told by the government was two things, and

11 what I was told by the defendant, was nothing.  The two things

12 that I was told was; number one, *Well, we need to do this*

13 *because otherwise all these cases are going to go to trial*.  My

14 reaction to that was, *You are kidding me, right*?  That's not my

15 problem.  It is my problem, but it's not my problem in terms of

16 calculating guidelines.  There's no guideline or application

17 note that says, *If it means the government has to go to trial,*

18 *don't use this guideline*, *use some other calculation.*  That I

19 brushed off fairly quickly.

20         The second thing that I was told was, *Well, you can't*

21 *use intended loss, because we can't prove what intended loss*

22 *is, because this is all very complicated, and, you know, these*

23 *complicated formulas, they are just not known to the defendant*.

24 I then responded, anticipating that, I took five minutes to go

25 on the internet, and in five minutes, I could see applications

1   and instructions for the applications.  Admittedly, the

2   instruction I looked at was for the time period when -- and

3   this is not our time period -- when the maximum loan amount was

4   increased.  I think the first go around was hundred fifty

5   thousand then increased to half million, at some point I think

6   it even went up to two million.  But I could look at it and

7   say, *What's so complicated*?  Here's the instruction, that they

8   provide online, when you are filling out these applications,

9   telling you when you make this entry and that entry, here's the

10   relationship; and to be clear, we are all in agreement that the

11   relationship is not all that complicated.

12          You put in, you know, basically, your gross receipts,

13   and you put in the cost of goods sold, you subtract them, I'm

14   going to call it profits, and you divide by two, an eighth

15   grader could do this math.  This is not this complicated.

16          In terms of the PPP loans, I pulled up -- and I filed

17   these documents in *Stonebarger*.  I pulled up the application.

18   Line four, of the application, has printed right on it, what

19   the formula is.  Again, an eighth grader, with bad math skills,

20   but a calculator available, could figure this out, and I found

21   the government's position to be unconvincing, and I used

22   intended loss as the loss amount using some, but not all of the

23   applications.  The parties were aware of it.

24          What happened in this case, however is, I get the

25   Presentence Report, and lo and behold, when you get to

1   paragraph 50, there's this -- well, look at paragraphs 49 and

2   50, there's this chart at paragraph 50, which is called *Loss*

3   *Calculation*, and it lays out the number of loans.  It lays out

4   the eligible loan amounts.  It totals them up to $1.3 million,

5   and then -- but, for no particular reason, says, total loss,

6   $367,000, and that is the amount that was funded and received

7   by Mr. Foreman and/or Mr. Simbeck and/or Ms. Irish, and it also

8   said, additionally, there's 24 other applications that came

9   from Mr. Foreman.

10          *MS. BUTTERTON:*  Your --

11          *THE COURT:*  I will quote what it says, quote,

12   *Additionally, SBA records and IP subscriber information reflect*

13   *that 24 EIDL applications were submitted from an IP address*

14   *subscribed by Foreman*--

15          *MS. BUTTERTON:*  But that doesn't mean that Mr. Foreman

16   -- I'm sorry, I didn't stand.  I will just add it to my list,

17   but I just want to say, just because they are submitted from

18   his IP address, doesn't mean that he submitted them.

19          *THE COURT:*  Okay.  So, at this point, I'm now faced

20   with the fact that, in one case, probation says use intended

21   loss, in another case, it says use actual -- actual loss only,

22   and there's no explanation.

23          I know what the explanation is.  I'm not trying to

24   throw rocks at probation.  There's a couple of different

25   supervisors, one came from one supervisor, the other came from

1  the other supervisor and they were either unaware or

2  uninterested in what the other one was doing.

3          So, at this point, I'm looking at it, going, *Well, all*

4  *right, I can understand the inconsistency, but I can't do this.*

5  *I can't be coming into court, letting my position be a function*

6  *of whether this probation officer is consistent or inconsistent*

7  *with what that probation officer is saying.*  I send an email to

8  the probation officer in this case, saying, *I want to see the*

9  *applications*, because I have said that in -- in *Stonebarger.*

10         Interestingly, around the same time, on the same day,

11  separated by, at most, a matter of hours, Mr. Brown filed

12  something called the -- that I referenced earlier, the Notice

13  Re: Loss Amount And Intended Loss, and he provided some more

14  background about these matters that are listed in paragraph 50

15  of the Presentence Report.

16         But by that time I had sent an email to probation

17  saying, *I want to see the applications.*  At that point, I sent

18  an email to both Mr. Brown and Ms. Butterton saying, *Ships are*

19  *passing in the night.  I don't care where I get it from, I'm*

20  *just letting you know, I want to see the applications.*  And I

21  believe that I received a response from Mr. Brown copying

22  Ms. Butterton saying, *Well, we will get together with probation*

23  *and you will either get it from us, get it from them,* and I

24  ultimately, got it from them; them being, the probation office.

25  And what I have got is the chart that I have given you, as well

1   as the individual applications, the 24-additional applications,

2   which I looked at and quickly determined were not very helpful

3   to me; the applications themselves, simply because the way it

4   works, is you apply online, you put in for question one, yes

5   no, whatever it may be, address, and what remains in the small

6   business administration is the extractions of the answers, and

7   so I will have a sheet of paper that says, yes, no, here's my

8   name, here's my address, whatever.  It does not -- it's not the

9   application as seen by the individual filling it out, that has

10  the definitions and information and all of the rest of it.  So,

11  there we go.

12         Well, because I believe and try to be consistent,

13  whether I achieve it or not, I basically said, *No, I did it*

14  *before, and I am going to stand by what I did*; which is I'm

15  going to say that the loss calculation is exactly what the

16  guideline says, which is the greater of actual or intended and

17  in this case, I think actual -- actual understates the loss.

18         I took two very different approaches to come up with

19  how I was going to do this.  Number one, I took the numbers

20  from paragraph 50, and that's real easy, 3.1 -- excuse me --

21  1.3 million, when you go to the loss table, it's not the

22  plus-12 that the probation office used.  It -- it is the next

23  one up.  It's a plus-14, more than 500,000 but less than 1.5

24  million, and I park that and called that my most, for lack of a

25  better term, liberal approach.

1     And then I decided I would take an ultraconservative

2 approach.  Now, what was that ultraconservative approach?  This

3 is -- get your pens out, and you are -- it would help you if

4 you have that chart that was filed, to follow along.

5          MS. BUTTERTON:  Oh, I have it.

6          THE COURT:  I suspected that you did.

7          THE COURT:  What I --

8          MS. BUTTERTON:  Your Honor, I'm sorry.  There are a

9 million charts.  Are you talking about **Document 60**, that you

10 filed?

11          THE COURT:  Yeah, that's exactly it.  Yep.  I said

12 Well, I'm not going to assume anything that he knows.  What I'm

13 going do is I'm going look to when the first time he got money

14 was.  And I know what that is, by looking at the Plea Agreement

15 and the Presentence Report, that was the ECS Consulting, where,

16 on June 23, of 2020, it was funded, he got a $10,000 advance,

17 three days later he got $35,500, and the total amount that's

18 included in your actual loss figures, total amount from that

19 ECS Consulting application was 45,5'.

20          I said all right, I'm going to take only those

21 applications from **Document Number 60**, that were submitted after

22 he got this money, and there are seven of them.  They are on

23 lines 19 through 25 of the spreadsheet.  Fusion Group down

24 through Mile High Cleaning Service, and each of those was

25 submitted after June 26th, after he had some basis for putting

1    a monetary value on these loan requests.

2          Because I said I was being ultraconservative, I did

3    two additional things.  I threw out the first two, Fusion Group

4    and Grand Luxury Marketing, on lines 19 and 20.  Why?  Because

5    eventually he gets a loan funded for those entities, and even I

6    am not going to say that if an individual puts in multiple

7    loans, for the same entity, he reasonably expects that the

8    government is going to keep funding the same company over and

9    over again.

10          So, since these eventually get funded and eventually

11   find their way into the hard-dollar-loss column, I took them

12   out.  That left me with five.  Then I said well, he got 45,5'

13   from ECS, I'm only going to use 40.  I'm going to build in a

14   margin for error for those five, and I am going to consider

15   those intended as only for 40,000 a piece; 40,000 times five,

16   $200,000.

17          I then went to the PPP loan, and did, essentially, the

18   same thing.  I said, *Well, is there a point in time when*

19   *Mr. Foreman actually got money from a PPP loan*?  Yes, there is.

20   He had a PPP loan in the amount of $20,000 dollars -- 20,052,

21   two, zero, comma, zero, five, two, funded, and he received

22   the -- that sum of money, on May 26 of 2020.  Well, I'm only

23   going to look at ones that were funded after May 26, 2020, and

24   there's only one.  The one to Melissa Irish.  What's the

25   amount?  20,188.  I'm going to use the 20,000 figure.  We will

 1   get rid of the additional odd dollars.  Why am I using the

 2   $20,000 figure?  Because I'm comfortable with it.  Why am I

 3   comfortable with it?  Because the one that was funded was an

 4   application where Mr. Foreman reported a monthly payroll of

 5   $8,021.  On this one, the monthly payroll was 8,075.  It's

 6   almost the exact figures.

 7        So, from that payroll, he knew what money he got.  So

 8   again, I took that payroll and assumed a $20,000 figure.  I add

 9   the PPP to the EIDL, I come up $220,000, additional, above the

10   367', that we know was actually funded.  You add them up, and

11   bottom line, you come up with two levels higher.  You are in

12   550 to $1.5 million, and I am not doing anything more than

13   that.

14        And then I sit back and grin, because when I take the

15   most conservative approach possible, I come up with a plus-14,

16   and when I take the most liberal approach possible, I come up

17   with a plus-14, and something starts to feel right about that

18   for me.

19        Now, let's just be clear, in terms of what I have done

20   by way of intended loss is of these 24-additional applications,

21   I only counted five of them.  There's 19 of them that I just

22   threw into the wind.  Just to be ultra conservative.  I only

23   credited $40,000 to it, even though, on four of the five, he

24   was eligible for a loan amount of $150,000, and I ignore the

25   fact that I believe that he knew, roughly, the amount of money

1  that he was intending to get.  Why do I say that?  Well, when I

2  look at these things, what jumps out at me is that in each of

3  these applications, you are putting in the gross receipts and

4  the costs of goods sold.  Remember what I said, with regard to

5  the ECI Consulting.  The ECI Consulting got 45,5', there was a

6  $91,000 profit spread.

7        Look down this chart, temporally, as we go from

8  those -- the earlier ones filed to the later ones filed, there

9  are some differences, but what you will notice is that the

10  spread between gross receipts and costs of goods sold, widens.

11  Widens, greatly, to where, when we get to the seven that I was

12  originally considering, the spread is, and I am just going to

13  read these off, I don't have them in order $451,000, $459,000,

14  $415,000, $556,000, $484,000, $473,000 and $80,000.  If a

15  $91,000 spread yields 45,5', what does a half-million dollars

16  yield?  In my most conservative approach I didn't even answer

17  the question.  I said I'm just going to go with what he got in

18  his pocket, less than that $40,000.

19        I think, that under the guideline, I am required to do

20  something that constitutes a, quote, reasonable estimation of

21  the loss, and that is what I have done.  I have done it in two

22  different ways.  Both of them come out the same.  It's a

23  plus-14, and that's what I'm going to do.

24        Now, with regard to that, there are two additional

25  observations.  Additional observation one is one that I smiled

1   at, at the time of the Change of Plea, and I continue to smile

2   at.  In the Plea Agreement, paragraph ... where is it ... there

3   we go, page 15 of 17, when they were doing the Wire Fraud

4   count, the parties put in, it's a plus-12, quote, because the

5   loss, paren, including intended loss, closed paren, was between

6   250,000 and $550,000.

7          You guys knew what the guideline says, and you guys

8   knew what I had done in *Stonebarger*, and you threw this little

9   bone out there, for me, saying, *Hey, we have included intended*

10  *loss, and look, it's a plus-12*.  Nowhere is there any

11  explanation of that in the plea documents.

12         When I start saying, I'm going to use intended loss,

13  do I get any explanation from either of the parties as to how

14  their calculation of intended loss yields a plus-12?  No.  What

15  I get from the government is, *Hey, you are doing this weird*

16  *thing in Stonebarger we are aware of it we are not backing off*

17  *our plea, but here's the numbers*.  What I get from the

18  defendant is not, *Here's the way that the intended-loss*

19  *calculation comes out to be plus-12*.  What I get is, *You can't*

20  *use intended loss.  Kaiser objection*.  As I said, it makes me

21  smile, but that's all.

22         So, that's what I'm doing, and I am going to let you

23  make your record.  I have talked for a great deal of time, but

24  I needed to explain to you how I got where I got, and the fact

25  is, if I wanted to get to 16 -- well, let me put it this way.

1   It's not about what I want.  But if you took the 24, just the

2   24 applications, that are in **Document ECF Number 60**, and

3   totaled up the loan amounts that he attempted and added it to

4   the PPP -- EIDL and the PPP, the number that I would get is

5   about $2.8 million, and I would be plus-16 instead of plus-14.

6   I didn't do that, because I tried to come up with what I

7   believed to be a reasonable calculation.  I have done it

8   multiple ways and it points to the same spot.

9        So, I will now let you make whatever objections you

10   want to make, and I will try to deal with them.  I'm not

11   unmindful of the fact, Ms. Butterton,  that there's *Kaiser*

12   objection, and I have not addressed it yet, and it's out there

13   and I consider it to be an objection, and again, just to

14   complete the record, the reason is, in -- after another case

15   that she and I had, and I think was Mr. McIntyre, if not

16   Mr. Brown, after that sentencing, I was asked, in the presence

17   of government counsel, whether or not she needed to wait until

18   she heard what I was going to do, and I said, I'm not going to

19   file anything more, go ahead and file your objections, assuming

20   that I'm going to do intended loss, and so, she did so.

21   Although, she did not have the benefit of the precise

22   calculations, at the time; because I hadn't done them, at the

23   time.

24        So, that's where I am, and ultimately what I am saying

25   to you is that I compute the guidelines differently than are

```
 1    computed in the Presentence Report.  I find it to be a Total
 2    Offense Level of 19, a Criminal History Category VI; and 19, VI
 3    is 63 to 78 months.
 4          Mr. Brown, anything you want to say I will listen to.
 5          MR. BROWN:  Not much, Your Honor.  One thing, I don't
 6    know if the Court thinks this is important or not, the Court
 7    mentioned an email that I had sent to the probation department
 8    that contained the actual applications, and I know they are not
 9    part of the record, but I have an exhibit that I could -- if
10    it's important --
11          THE COURT:  I trust that the parties know what those
12    documents are.  I don't think they need to be in the record,
13    because I looked at them, and I think I fairly described them.
14    It's basically an extract of the information that was put
15    online.
16          Ms. Butterton, if you want it on the record, I don't
17    have a problem with it.  I just don't think it's necessary.
18          MS. BUTTERTON:  You know, it may be cleaner if they
19    are on the record.
20          THE COURT:  That's fine.
21          MS. BUTTERTON:  I have them.
22          THE COURT:  No, that's fine.
23          MS. BUTTERTON:  I have been given them all along.  It
24    may be helpful ... I don't know.
25          THE COURT:  Whatever.  I'm good with it.
```

1         *MS. BUTTERTON:* Putting them in the record can't hurt.

2         *THE COURT:* They have now been handed to Ms. Pearson,

3  who -- I don't know -- you keep them?

4         *THE COURTROOM DEPUTY:* Okay.

5         *THE COURT:* In fact, I have them up here.

6         *MR. BROWN:* Your Honor, it's referred to as Sentencing

7  Exhibit 2.

8         *THE COURT:* Fine.

9         *MR. BROWN:* I had Sentencing Exhibit 1, but that's

10  essentially **Docket 60**. The only thing I would quarrel with the

11  Court about is reference to my suggestion that the Court had

12  this weird theory from *Stonebarger*.

13         *THE COURT:* I didn't mean anything by it. You said --

14  okay. So you didn't call it weird, you -- let me get it

15  correct ... you said that you were aware of, quote, this

16  Court's approach, and actually that's correct, but it actually

17  was probation's approach that I agreed with, but ...

18  potato/potato.

19         *MR. BROWN:* No, I mean I ... I ... um ... in terms of

20  the Court's calculation, I don't want to make the Court smile

21  again, but I understand that you are taking senior status soon

22  and I also understand --

23         *THE COURT:* So, are you calling me old and unable to

24  do math?

25         *MR. BROWN:* No, I'm not. I'm suggesting that I

 1  understand the IRS is going to hire 80-some-thousand new agents

 2  and perhaps you might want to, because your analysis went far

 3  beyond --

 4          *THE COURT:*  I'm not leaving.  I'm just taking senior

 5  status.

 6          *MR. BROWN:*  I was trying to make you smile.

 7          *THE COURT:*  No.  You did.  The whole case makes me

 8  smile.

 9          *MR. BROWN:*  I mean, it's important to Mr. Foreman.

10          *THE COURT:*  And I am not trying to be cute, here.  I

11  mean, literally, I looked at this and said let me take vastly

12  different approaches and see where they come out, and they

13  landed in exactly the same spot, and that tends to be

14  persuasive of something to me.

15          *MR. BROWN:*  I think it's fairly -- it may be obvious,

16  but I will fall on the sword if we have to, I didn't take the

17  approach that the U.S. Attorney's Office took in *Stonebarger*,

18  because that approach, as the Court recognized, didn't make

19  much sense.  On the other hand, I should have been arguing with

20  Ms. Butterton that intended loss should be it, and we should

21  have been arguing about that in the Plea Agreement, on the

22  record.

23          *THE COURT:*  Oh, but you already included it in the

24  Plea Agreement in a brilliant, tactical move.  That is being

25  said with a smile on my face.

1          MR. BROWN:  I can't take credit for that.  I have

2     nothing else.

3          THE COURT:  Well, I should get one thing from you,

4     because I know I'm going to hear at least this from

5     Ms. Butterton, and I think fairly, I'm not trying to criticize

6     her, who now has a smile on her face, one of the things that's

7     going to be said is, *Well, look, the fact that, you know, this*

8     *comes from an IP address subscribed to by Mr. Foreman, you*

9     *shouldn't really use that.  It really doesn't ... it doesn't*

10    *work, because it could be somebody else just, kind of, over at*

11    *his house, using the computer.*

12          First, am I correct that Exhibit 60 comes from his IP

13    address?

14          MR. BROWN:  Yes, Your Honor.

15          THE COURT:  At least insofar as the 7 slash 5 that I'm

16    considering, because I don't, frankly, care about the others.

17          MR. BROWN:  Your Honor, was number 19 on the number --

18    in the ...

19          THE COURT:  Number 19 was one of the original seven

20    but it's one of two that I threw out.

21          MR. BROWN:  Okay.  All right.  Then I don't need --

22    there's a bit of a different explanation on that.

23          THE COURT:  But as to the five, I'm correct, right?

24          MR. BROWN:  Yes.

25          THE COURT:  Am I also correct, that with respect to

1  this chart, that's Exhibit Number 60, where there's a claim

2  that the IP address somehow is an inadequate basis, that what

3  is line 18 and what is line 21, corresponds to the very

4  applications that were included in the Indictment, as Counts 6

5  and 7?

6          *MR. BROWN:*  That's correct, Your Honor.

7          *THE COURT:*  And I assume I am also correct in the

8  third respect; and that is, that in terms of the Presentence

9  Report's assessment of those various loans, including the ones

10 that were fully funded and counted as being attributable to

11 Mr. Foreman, that those came from the same IP address?

12         *MR. BROWN:*  Yes.

13         *THE COURT:*  Okay.

14         *MR. BROWN:*  Your Honor, since I mentioned it, with

15 regard to 19, which you didn't consider, which -- so it's

16 probably pointless of me saying that, but since I brought it

17 up.  We did not have IP address information on that, because

18 that was I think Simbeck made that application on behalf of

19 something called Fusion Group.

20         We have information from, I believe, the Colorado

21 Secretary of State that Mr. Foreman's name was on the

22 application for the creation for that company, but you didn't

23 count it, so it doesn't matter.

24         *THE COURT:*  I suppose if I'm going to add to it, the

25 other thing that I could say is, with regard to those matters

1   that are in the Presentence Report, that no objection was made

2   to as being attributable -- well, no objection was being made

3   to as being part of the loss calculation for Mr. Foreman, the

4   name Melissa Irish appears, Mile High Cleaning Service appears,

5   Quantum Boost Technology appears, and those are names that are

6   identical for three of the five that I counted from Exhibit 60;

7   correct again?

8          MR. BROWN:  Yes.

9          THE COURT:  All right.  Ms. Butterton, you are up.

10          MS. BUTTERTON:  Well, couple of just preliminary

11   things.  I was prepared to go through every loan, and I

12   understand that the Court has an obligation to make a

13   reasonable estimate of loss.

14          So, I will start with my -- the second preliminary

15   thing is, I think.  Occasionally, defendants find it difficult

16   when we start talking, broadly, about legal concepts.  It feels

17   very impersonal, I want to acknowledge, Mr. Foreman, some of

18   what we're talking about, I have feelings about as an advocate

19   about preserving certain issues.  It may seem very separate

20   from your case, but, um, in some ways it's not.

21          THE COURT:  Look, the guidelines are an archaic

22   ritualistic language that gets spoken, and I just have to speak

23   that language, before I can get to the ultimate sentence.

24          MS. BUTTERTON:  So, I will not spend a lot of time on

25   my *Kaiser* argument, because I think that's the place to start,

1   because it basically says, you know, the Court said the

2   guidelines say the greater of intended or actual loss, and in

3   my, probably inappropriately sassy response is, the guideline

4   don't say.  The commentary says that.

5        THE COURT:  There's nothing inappropriately sassy

6   about it.

7        MS. BUTTERTON:  The commentary says that.  We all know

8   that, that's what the commentary says, and I am not going to

9   belabor this point, except to say that this is -- these type of

10  objections to commentary that, you know, ostensibly modifies

11  the substance of the guideline, are relatively new, newish,

12  emerging around the country.

13       The Tenth has not spoken as to this guideline on this

14  issue.  We've most recently seen it in the -- and I think, you

15  know, strongly so, in the -- we're talking about, you know,

16  fraudulent credit cards, using that $500-loss amount, that's a

17  fascinating issue, that I would love, and am going to be

18  arguing in other cases.

19       I don't think this issue is dissimilar.  It's not as

20  specific, the guidelines don't say, *Hey, $500 a card for no*

21  *reason*.  Instead, they say, We need to look at what was in

22  somebody's heart, and we need to look at maybe what was in

23  somebody -- possibly in somebody's brain, and what they really

24  wanted to happen.  I'm obviously colloquializing.

25       THE COURT:  I get that; loosely stated, I don't

1   disagree that.

2          *MS. BUTTERTON:*  And I understand --

3          *THE COURT:*  And I tried to do that.

4          *MS. BUTTERTON:*  Well, I will get to that in a second,

5   but what I will say is I think that the *Kaiser* argument is

6   right.  I think it's interesting, and I think that at some

7   point the appellate court is going to look at it.  I'm not

8   saying it's going to be necessarily in this case, but I think

9   it's a legitimate issue, and I think that the commentary

10  legitimately changes the ordinary meaning of the word loss.  I

11  won't belabor that point, because I know the Court has already

12  ruled on that.

13         *THE COURT:*  Let me pause, get it out of the the way.

14  I'm overruling the *Kaiser* objection.  I'm doing so on multiple

15  grounds; number one, I reject the notion that the word loss is

16  as unambiguous as you say.  In fact, the word loss, within the

17  meaning of the guideline, if I were to adopt this *Kaiser*

18  argument, we would have a whole bunch of interesting

19  discussions, in subsequent cases.

20         It is not uncommon that I see, in restitution cases,

21  victims requesting all kinds of moneys, and I understand the

22  restitution statute guideline we're talking about different

23  things, but the notion that someone -- if it's just loss, well,

24  okay, he convinced me to send all of the money from my bank

25  account to his fraudulent... whatever it is, and I did so and I

1    was expecting a return and I didn't get it, because I sent my

2    money, I lost my house, and they repossessed my car and I lost

3    my job.  So, he got my $20,000, I want, now, $600,00 in loss.

4    That is loss; that is what that person lost.  The interesting

5    thing is the guideline, even as to actual, contains definitions

6    that you are more than fine with, which is reasonably

7    foreseeable loss.  So, you are kind of cherrypicking what you

8    want this guideline to say, and I think that -- that these

9    terms are not as crystal clear, especially in the criminal-law

10   context.  I think there's ambiguity.  I think it is appropriate

11   for the Commission to say what it means in a particular

12   guideline, by a particular term, number one.

13           Number two, I agree with, is it the Fourth Circuit ...

14   the case that was cited by the government, where the Circuit,

15   in essence, pointed out that this is different.  This is -- a

16   Sentencing Commission it's quasi judicial, and on top of that,

17   this is not a scenario where, by virtue of the fact that I

18   apply the definition of the agency, that that somehow means

19   that the individual is stuck with the ramifications of that.

20           I always have the ability to disagree with the

21   guideline, to disagree with the calculation, in a particular

22   case, as applied or in general, and so the notion that this --

23   that absent some kind of *Kaiser* interpretation, there are these

24   congressionally unintended consequences coming about that

25   handcuff individuals such as Mr. Foreman, it's just not true.

 1   It might be true if it were the Social Security Administration,

 2   doing something that was impacting, with no recourse, what he

 3   could do, by way of getting disability or something -- whatever

 4   it is.  A payment, or something along those lines.  But that's

 5   not this scenario, and so I just don't think that *Kaiser*

 6   applies, in any event.

 7         So, if you want to make more *Kaiser* record while we

 8   are here, otherwise-

 9         *MS. BUTTERTON:*  No.  I mean, really, the only other

10   thing I would say is *Kaiser*, in some ways, empowers Courts to

11   say, *Loss is what you lost and also I can vary upward or*

12   *downward* and I understand you can do that anyway.  You can say,

13   *Also, the evidence shows I know in your heart you were trying*

14   *to do X, Y and Z.*

15         I guess I'm saying that the Court can do whatever it

16   wants, once the calculations are calculated.  My position is it

17   should be on actual loss, because it has plain meaning, and I

18   think we have reached an impasse in which you control the

19   destiny of the guideline calculation in this courtroom.

20         *THE COURT:*  All right.

21         *MS. BUTTERTON:*  Secondly, I was anticipating the Court

22   to go about this in a different way.  It's difficult for me to

23   quarrel with what the Court -- how the Court did this.  In

24   other words, once you got the money you could *back-figure-out*

25   what you could get, and I think I'm going to rest on my *Kaiser*

28

1    laurels. I do think that IP address is not the strongest

2    evidence in the world. Do I think there's other evidence out

3    there? Sure.

4         THE COURT: I grant you, that's not the strongest

5    evidence in the world; that's not the issue; the issue is

6    preponderance. The issue is the same IP address that's used

7    for those other loans that were funded. There's no dispute

8    that they were -- that it was Foreman's IP address; there's no

9    dispute that the entities are also -- there's overlap between

10   the entities that were funded and the entities that were on

11   this list that -- I'm sorry. There is overlap between the

12   entities listed in paragraph 50, as to which no objection was

13   made, and the entities listed in **ECF Number 60**, as to which

14   some quarrel is being made.

15        I just think that the overlap, the IP address being

16   not controverted, in any way, as being Mr. Foreman's, the fact

17   that we're talking about the same kind -- the same types of

18   businesses, that are clearly -- clearly point to him, and the

19   fact that some of these, that we say, *that's not good enough*,

20   it's in the Indictment, which means, something. I just think

21   you are right, we can quarrel about it, but I think the

22   evidence is sufficient to establish by a preponderance that's

23   what I'm relying on.

24        MS. BUTTERTON: Having said that, and with everything

25   that I previously said, the only thing I wanted to note about

1  **ECF 60**, and I am just comparing to what Mr. Brown handed me.

2  Yeah, okay.  The quarrel, and I think this is the quarrel that

3  I initially had with the spreadsheet was, and I think everyone

4  thought it was about the IP address, I mean, I have a minor

5  quarrel, but it was about the loan amount attempted and how it

6  was characterized, I think now that the Court has described its

7  processes for calculating loss, this becomes a less important

8  objection, but my objection really was to that -- was to that

9  column, to say, Well, this was attempted, because that has a

10 legal meaning, and that, you know, these were -- this was the

11 amount that he was attempting to get, and I just take issue

12 with that broad characterization of every number on this chart.

13       THE COURT:  I get that, and as you now know, I

14 attempted to account for that, and now, whether -- look, you

15 still have an objection and I am not asking you to agree.  I'm

16 not asking Mr. Foreman to agree.  In fact, I note that you

17 disagree, but as you know by now, I don't take anything that

18 any side gives to me without a grain of salt.

19       MS. BUTTERTON:  I think Mr. Brown and I are well aware

20 of that.

21       THE COURT:  I was looking at the numbers; the labels

22 on the chart, I don't care about that.

23       MS. BUTTERTON:  All right.  That was the only other

24 issue, you know.  My other objections outstanding, I don't

25 think I have anything else to add.

1          *THE COURT:* All right.  Okay.  With all of that --

2          *MS. BUTTERTON:* Unless you want to talk about the

3    supervised-release conditions?

4          *THE COURT:* Now I'm moving to the supervised-release

5    conditions.  You might as well sit down, grab your notepad,

6    again.  I'm going to do some things that are probably not

7    anticipated.

8          The objections -- the first objection was to the

9    requirement for mandatory sex-offender registration, that was

10   included in the draft.  It has been removed in the final, so

11   that objection is now moot, because that requirement is no

12   longer applicable to Mr. Foreman.

13         I believe the second objection related to sex-offender

14   evaluation and treatment, as a special condition.  That is

15   still live, because probation has indicated that it is not --

16   it cannot see whether or not Mr. Foreman actually completed

17   sex-offender treatment.  That may be and I don't care.  I'm

18   not -- I'm not imposing that condition.  It's -- the offense

19   that occurred, occurred in 1998.  It has absolutely nothing to

20   do with this crime.  I'm not here to say that, I'm going to

21   make sure that somebody got treated for something that happened

22   in 1998 in another District, in the State of Texas, and that

23   absent that, I have got some kind of authority to order

24   sex-offender treatment.  Nobody would even consider it if it

25   were a gambling offense, and probation said, *We don't know that*

1  *he had treatment for his gambling problem, therefore, I'm going*

2  *to order gambling evaluation or treatment,* or whatever.

3          The only reason is that it's a sex case, and it is a

4  reprehensible sex case, but that being said, it's 24-years ago,

5  and I'm not imposing the condition.  I just don't believe it's

6  appropriate.  I don't think that there's a basis.  I don't

7  think it's reasonably related.

8          You are turning red.  Please, take your time.  The

9  record is always a mess when I say things like that.

10  Ms. Butterton was apparently choking.  I just want to make sure

11  that she is okay before I continue.  We good?

12          *MS. BUTTERTON:*  We're good.  Thank you, Your Honor.

13          *THE COURT:*  Okay.  The third objection seems moot.  It

14  was that the original draft of the Presentence Report contained

15  a broad search condition that is broader than what we normally

16  do in this District; in that, it permitted search any time,

17  anywhere, so to speak.  The suggestion from the defendant was

18  that we use our more standard search condition, *reasonable*

19  *time, reasonable basis*, if there's a reason to believe that a

20  violation has occurred, things of that nature, and probation

21  did, in fact, revise it, and that's fine, and I am still not

22  giving it, and the reason that I'm not giving it is, people can

23  say it out loud or not say it out loud, the only reason there's

24  a search condition here is over that sex thing.

25          This is a financial crime.  The obligations are that

```
 1    he is required to produce financial information and all of the
 2    rest of it, that are standard for financial cases.
 3            When I look at the justification for this -- this
 4    tendered search condition, it says, *A search condition is*
 5    *recommended based on the defendant's sex-offense history.*
 6    Yeah, that's the whole thing; and history means, one case and a
 7    few failure to registers, and that's what this is, and then
 8    there's tossed in, *and the circumstances of the instant*
 9    *offense*.
10            This case is no different when looked at as a
11    COVID-fraud case from any other COVID-fraud case.  I'm not
12    giving a search condition.
13            And I am not giving a substance-abuse condition
14    either, even though there was no objection to it.  The reason
15    is, special conditions I have to look at, and I look at those,
16    the same way I look at intended loss.  I'm going to make my own
17    evaluation and look at these things, when I'm looking at the
18    drug, what I do is I say, *Okay, why am I doing that*?  And I
19    look back to the sections of the Presentence Report that talk
20    about substance-abuse history, and it ain't much.  Paragraph
21    111 and 112.  Paragraph 112 is *he denies any other use of*
22    *illicit substances*.  So that's not very helpful.  Paragraph 111
23    says two things, *One, he started drinking or he first drank*
24    *when he was 13 or 14.  He doesn't drink alcohol often and the*
25    *last time is when he had a beer for his birthday*.  I'm not
```

1    giving treatment for that.  I'm not giving evaluation for that.

2         Second thing is that he uses marijuana to alleviate

3    pain.  Marijuana is a tricky issue.  If all that's there is

4    marijuana, my view on that is this, he is required, as a matter

5    of mandatory conditions, to give a certain number of drug

6    tests.  He will.  And at that point, we will see where we are.

7    If it's marijuana, only, we will see where we are.  If there's

8    a doctor's prescription, we will see whether or not I care

9    about that.  Obviously, if it's marijuana laced with something

10   else, it's a whole different animal.  I will have more

11   information on the back end, and probation has the option to

12   move for a modification.

13        In terms of the front end, I'm not going to order

14   drug-offender treatment and evaluation simply for marijuana and

15   marijuana alone.

16        So, with all of that, Ms. Butterton, where are you?

17        MS. BUTTERTON:  I don't have anything to add.

18        THE COURT:  Mr. Brown, some of these are your oxen

19   that I'm goring.

20        MR. BROWN:  Your Honor, I don't think anything that

21   the Court said was unreasonable.

22        THE COURT:  All right.  Then we get to the bottom

23   line, and the bottom line is, well, what is the appropriate

24   sentence?  I don't want to be ... too dismissive here.  Part of

25   the request -- well, the government is saying 63 months, which

1   was the top of the guideline range, and they are bound,

2   notwithstanding the fact that I moved the guideline range, as I

3   clarified at the Change of Plea, they are bound to request a

4   number between the guideline range as calculated in the Plea

5   Agreement, which I believe was 51 to 63.

6          So, knowing that I'm going to hear from you, I'm sure,

7   that says some number that's in that range, and I am aware of

8   the fact that Ms. Butterton has requested for 30 months, and

9   that that request exists, notwithstanding whatever I may say

10  and have now said about *Kaiser*.

11         So, I don't want to give short shrift to these things,

12  but I will invite to you speak to them.

13         *MR. BROWN:*  Your Honor, as the Court pointed out, I

14  filed a pleading that indicated I would recommend 63 months,

15  which is within the guideline of what we --

16         *THE COURT:*  Also happens to be in the guideline that

17  came up with.

18         *MR. BROWN:*  Just happens to be in the guideline, at

19  the bottom of the guideline, of the new guideline.  Your Honor

20  if ... given how long tooth some of us are in this courtroom,

21  primarily me --

22         *THE COURT:*  You just keep calling me old, don't you?

23         *MR. BROWN:*  No, I'm talking about me.

24         *THE COURT:*  I was going to say, old guys can put up a

25  little resistance.  All right.

1          *MR. BROWN:*  We get kind of jaded in here sometimes,
2    and Mr. Foreman has been in a few courtrooms in his life, so he
3    has heard it before, but -- and a lot of times when we're
4    talking about these COVID-fraud cases, the first thing us jaded
5    people say is, *How in the world could the government come up*
6    *with this program, where basically people are almost invited to*
7    *lie about things*, and all of a sudden you get a thousand dollar
8    ATM card or $10,000 grant for just filing the damn thing, and I
9    mean a Judge could say, *Well, the government imposes this*
10   *program, and people take -- people with questionable ethics*
11   *take advantage of it --*

12          *THE COURT:*  I'm not going down that road.  My view of
13   it is, does the government do things that sometimes are subject
14   to criticism?  Yeah.  Is this one of them?  Not really.
15   Because what we have is an emergency situation.  You are trying
16   to get money to people as quickly as you can to keep businesses
17   afloat.  I remember everything was shutdown.  People can't move
18   around.  In some -- well, in some places you can't move around,
19   and not only were businesses being propped up, but individuals
20   were also receiving checks.  It's an attempt to use the power
21   of the government to help the people in a time of real
22   emergency, and in those circumstances, the quicker, you can get
23   money to people, the better, the better off you are and they
24   are.  The problem is, the easier you make it to get money to
25   people, the easier it is for fraudsters to steal.

```
 1              MR. BROWN:  Well, that's sort of about where I was

 2   trying to head.  I mean, you have to, sort of, as hard as it

 3   may seem, to step back to 2020; seems like a decade ago, but it

 4   was only a few years ago -- couple years ago, and as the Court

 5   said, the government was trying to -- to throw a lifeline to a

 6   lot of companies, some of which were huge, some of which are

 7   little, and the lifeline was received by some and not received

 8   by others, and as we've seen, a lot of people just said, Hey,

 9   this sounds like a good idea.  And Ms. Butterton indicated

10   earlier that she was talking with some -- some type of

11   distinction about attempted loss, but I mean he was attempting

12   to get as much money as he could.  I mean, obviously, as the

13   Court pointed out, when you -- at the beginning of this

14   process, it was almost as though he wasn't quite sure how much

15   he could get.  Start out a little low, all of a sudden, Wow, I

16   might as well go for the whole thing.  But I mean ... I mean,

17   the defendant here is -- he is basically taking advantage of a

18   lifeline thrown out in the water to all kinds people, but he

19   wasn't in the water, but he was trying to grab the lifeline,

20   and among the things that I noticed in the probation

21   department's recommendation, when they get to their

22   recommendation part, they start out by saying the defendant is

23   before the Court after pleading guilty to his 12th felony

24   conviction, 12th.  Then they go on to recommend a bottom of the

25   guideline, which I don't understand.
```

1          THE COURT:  We all get to make recommendations.

2          MR. BROWN:  I -- I don't understand it.

3          THE COURT:  That's fair enough.  That's fair enough.

4          MR. BROWN:  I mean, the defendant did what he did, he

5    is who he is, and I understand he had a horrible life growing

6    up, but there's probably been a lot of people who had horrible

7    lives growing up who don't have 12 felony convictions and try

8    to steal as much money as they can, and they are still trying

9    to do it.  So that's primarily the basis for the government's

10   recommendation, Your Honor.

11         THE COURT:  Ms. Butterton, please, I don't want to

12   overstate the case, but I do want to be transparent; out of all

13   of the stuff that's floating around, the thing that's like a

14   pair of symbols banging in my head is, to be honest with you, I

15   don't know that I would be receptive to 30 months, if the

16   guideline were 24 to 30, because the thing that's banging in my

17   head, or the noise that's there is this, and you know this, I

18   just want to be clear about it, when we start looking at the

19   criminal record, the adult convictions, skipping the failure to

20   register, putting that to the side, the theft of rental

21   property, that's one; issuance of bad check; next one, forgery

22   check, commercial instrument; next one, attempted forgery of a

23   check, commercial instrument; next one, forgery of a check,

24   commercial instrument; a few of these are misdemeanors but many

25   are felonies; next one, identity theft; next one, identity

1    theft; next one, identity theft.  We are in a rut.  Next one,

2    identity theft.  Skipping over the failure to register; that's

3    where we are.  And then, cherry on sundae, so to speak, is he

4    is paroled in March of 2020, after doing a 7-year sentence, in

5    the state, for these various frauds, and three months after he

6    is paroled, he is knee-deep in ripping off the government.

7           It's a hard pill for me to swallow, and I am just

8    being upfront about it, so that you know what to aim at, if you

9    would.

10          MS. BUTTERTON:  Well, hard pills are, you know, my

11   bread and butter, sometimes.

12          Obviously, his criminal history.  I would love to get

13   up here and say Mr. Foreman, this is his first offense.  That's

14   not an uncommon argument in this building for financial

15   offenses.  So I'm very aware of the history that's here.  For

16   that reason, I think it's important to make a couple of

17   distinctions about, sort of, the nature of those and the nature

18   of this, and it has to do with the nature of the -- of the

19   victims.

20          I want to be very clear here, I understand, and

21   Mr. Foreman has conceded that money was taken from the United

22   States Government, and that means it's taken from all of us.  I

23   understand that, and I am not saying that that doesn't harm

24   society or harm the government.  I concede that those things

25   are true.  I think it's different than the offenses he has had

1   in the past that have more concrete, individualized victims, in

2   the sense of someone's bank account.  A person who is out

3   money.  A small business, or heck, a large business, right,

4   that is out money.  And I think that that's an important

5   distinction to make.  I'm not saying that the United States

6   Government doesn't also deserve to be made whole.  What I'm

7   saying is, when we are looking at the seriousness of a crime,

8   one thing that we look at are the -- is the victim impact, and

9   the impact, I think, is felt less in a -- in a -- as a

10  governmental victim than it is to say, Foot Locker, who is

11  selling shoes for a bad check or someone whose bank account is

12  being drawn on.

13         Now, Mr. Brown talked about, you know, a lifeline

14  being thrown out to the water.  I guess the water -- man, I

15  can't get out of this courtroom without making elaborate

16  metaphors; but the water being small businesses, medium-size

17  businesses, large businesses, that are... let's say they are

18  drowning, that's true, and we can see that Mr. Foreman took a

19  lifeline to which he was not entitled.  There's another saying

20  outside of in the water, that I'm going to characterize as in

21  the crap.  There's other ways to say that, but that's a common

22  saying.

23         THE COURT:  I'm aware of the more common saying, so go

24  ahead.

25         MS. BUTTERTON:  I think that while Mr. Foreman

 1  accessed a lifeline that he did not -- he was not entitled to,

 2  that does not mean that he wasn't also in the crap, in other

 3  ways.  You know, I don't have to tell the Court the difficulty

 4  that someone who -- someone who is, obviously, intelligent.

 5  These are not crimes that can necessarily easily be done

 6  without some, you know, understanding of how... I was going to

 7  say adult life -- *adulting* works, right; how financial systems

 8  work.  Mr. Foreman is a really intelligent guy.  Having said

 9  that, I think he is paroled, after a long stint in the Colorado

10  Department of Corrections, one that was not easy.  As I laid

11  out in my filings, and as the Court can see, and I will put on

12  the record that Mr. Foreman has physical limitations.  He uses

13  a wheelchair.

14          *THE COURT:*  Right.

15          *MS. BUTTERTON:*  And acquiring employment in those --

16  with these combinations, felon, with financial crimes in your

17  background, and physical limitation.  So, you know, he can't go

18  work at Taco Bell, because he can't stand for any length of

19  time, puts someone in the crap.  Does that justify what

20  happened?  It does not justify.  Of course it doesn't.  If

21  there was a legal defense to that, then I would be saying that

22  to 12 people sitting in the box over here.

23          What I'm saying is, is economic desperation drives

24  people to break the law.  It drives people to break the law

25  when they have 30 pounds of heroin in the trunk, it drives

1   people to break the law when they are trying to feed their

2   family and selling whatever illegal thing they are doing.  This

3   is a root of criminality, is economic desperation, and I think

4   he used the tools that were available to him.

5            Again, I don't say that as a legal justification.  I

6   say that to place context on what was going on.  You have a

7   wheelchair-bound guy who is living in his sister's basement and

8   this is what he did to get money.

9            I would argue that that situation is different, and it

10  is -- has an inherently different, I'm going to say, weight, I

11  think what I mean is seriousness, than the guy who -- the other

12  types of fraud; than the guy who is, you know, calling

13  octogenarians to get them to give him money.  It's a different

14  kind of fraud than the person who was stealing from the

15  teacher's retirement account.  These are sort of extreme

16  examples.  What I'm saying is not all frauds are the same.

17           We're requesting 30 months for a couple of reasons,

18  one, because the overall context of what was going on at the

19  time, and look, I get it, he was on parole, he got points for

20  that, right, that's included in his criminal-history score,

21  when he was on parole, when this happened.  I think that also

22  again, paints the picture of what was happening at the time,

23  but, really, the thrust of why we're asking for that is --

24           *THE COURT:*  I just have to push back.  Yes, it was

25  included in his criminal-history score.  Let's take it out of

```
 1   his criminal-history score and what do we got?  We still got 20

 2   points.

 3        MS. BUTTERTON:  I hear you.  Having said all -- well,

 4   and he is a VI, that is what it is.  I'm not asking for, you

 5   know, some sort of departure based on overrepresentation of

 6   criminal history.  It is what it is.

 7        All that to say is Mr. Foreman's prison time is not

 8   going going to be the same as the average defendant's.  It's

 9   just not, by nature of his health conditions, and it's really

10   two separate things, one is health conditions.  He has heart

11   failure.  We attached a letter from his doctor.  I think his --

12   you know, that limits his life expectancy, that's not included

13   in the letter, and I am not a doctor.  I can' say, Well, he has

14   got three months or whatever.  I'm not saying that.  What I'm

15   saying is, he is ill, he has health problems.

16        I don't think I'm saying anything that the Court

17   doesn't know, the BOP is not Johns Hopkins.  Okay.  This is not

18   going to be -- he is not going to receive the world's greatest

19   healthcare.  Hell, he is probably not going to receive the

20   world's most mediocre healthcare.  I say that and I think the

21   Court can draw from the Court's own experience in making that

22   assertion.

23        So, the health piece is one of them.  He needs a lot

24   of health concerns, that's why we are asking that the Court

25   recommend that he go to an FMC.
```

1          The physical part is separate, the underlying reasons

2   why, in a wheelchair aside, being in a wheelchair makes the

3   prison experience different for him.  There are things that he

4   will not be able to access.  I would love to see the ADA

5   compliance for USP Florence; I would really love to see what

6   that is, because I suspect, it ain't much.  In fact, I think

7   that the University of Denver Clinic, they have a clinic that

8   works with, for sort of, prisoner rights, and actually a member

9   of my office just recently joined that.  They have lawsuit

10  after lawsuit, right, BOP not being able and not really caring

11  to accommodate for people with disabilities.

12         His time is going to be harder than for an able-bodied

13  person; that's just a fact.  It's going to be harder, and also,

14  I think, in some some ways, it makes him more vulnerable that's

15  not as much of a concern, you know.  I think Mr. Foreman is a

16  physically robust guy, in bad situations can probably, you

17  know, defend himself, at the same time, he is in a wheelchair.

18  He is in a different -- he is just in, physically, a different

19  place.

20         So, I understand that the BOP is mandated to care for

21  people, and I'm sure that they will try to the absolute

22  limitations of their wildly understaffed facilities and

23  documented poor medical care, but the reality is, his time is

24  not going to be the same as an able-bodied, 39-year-old who

25  walks into your courtroom.  For that reason, we're asking for a

```
1    sentence underneath the guidelines.  I understand his prior

2    criminal offense.  He did, at that time, it was extremely

3    difficult, spent time, had a terrible fall, took months for him

4    to get the correct help for that.  I think probably part of the

5    reason he is still in a wheelchair is because the subpar

6    medical care, that was the DOC, it's a different organization,

7    but for those reasons, Your Honor, sort of the context of what

8    happened, the nature of this kind of fraud and his physical and

9    medical limitations, we're seeking a sentence below the

10   guideline.

11           THE COURT:  All right.  Let me raise with you the one

12   thing that I mentioned that I would come back to, and I forgot,

13   that's the preliminary order of forfeiture.  I don't know if

14   you have it?

15           MS. BUTTERTON:  I don't have it.

16           THE COURT:  It's okay, because I think --

17           MS. BUTTERTON:  It's easy enough for me to pull up,

18   but ...

19           THE COURT:  No.  I have got it right here.  There were

20   various items; item F was the following, approximately $36.58

21   seized from TD Ameritrade, account number 9345, in the name of

22   Russel Ray Foreman.  All of the other items listed here, are

23   items which were expressly included in the Plea Agreement

24   forfeiture provision.  To be clear that the specified items

25   were not an exclusive list, I'm not saying that they were, but
```

1    I am saying that given that this is the first time that this

2    appeared, I wanted to raise it, and say, is there any -- is

3    there really some challenge that's being issued, at this

4    juncture, recognizing, as well, that it is my intention, at the

5    time of imposition of sentence, to impose the money judgment,

6    and to make clear that Mr. Foreman is to get a credit against

7    that money judgment for the amount of items seized, and in

8    totaling up the amount of items seized, I'm including that 36

9    dollar and 58 cents.  I think it comes out in the wash, but I

10   don't think it's something that I should just kind of slide

11   past you or even attempt to do so.

12        *MS. BUTTERTON:*  First of all, I think that's ... my

13   memory of spreadsheets that said in my computer are little

14   foggy, but I think that's consistent with what was seized, and

15   I don't -- must have just -- I must have just missed it in the

16   Plea Agreement, frankly, forfeiture was probably, overall,

17   something I looked at less than other aspects.

18        *THE COURT:*  No, I get that, it's always included and

19   honestly, it's the bottom of everybody's least of concerns.

20        *MS. BUTTERTON:*  Having said that, of course, you know,

21   I don't think even if I objected, in this proceeding, I think

22   they could still do it, anyway, based on the included but --

23        *THE COURT:*  I agree with you.

24        *MS. BUTTERTON:*  -- not limited to language.  The most

25   important thing to Mr. Foreman, and therefore to me, is that

 1    any assets be deducted from the money judgment.  As long as the

 2    Court is doing that, I don't have any headache with the

 3    additional $36.

 4            THE COURT:  All right.  Would you then return to the

 5    table, move the microphone in front of Mr. Foreman, and let me

 6    say to you, sir, the following things, this is your opportunity

 7    to speak.

 8            There are a number of things that I want to tell you.

 9    First is, you are under no obligation to speak.  Obviously, I

10    have said a lot of things here today, but you are not required

11    to respond to things that you have heard me say or government

12    say or probation include in their Presentence Report.

13            If you choose to speak, you control what it is that

14    you speak about, and there is no penalty for your choice.  You

15    can speak about whatever you want to.  You can choose not to

16    speak about whatever you don't want to.

17            And finally, what I would say to you is this, if you

18    do choose to speak, don't spend any time worrying about a word

19    choice or slip of the tongue; none of that stuff means anything

20    to me.  I pay attention to the substance of what people say.

21    It's hard enough, in these circumstances, without worrying

22    about, *Oh my goodness, if I say ... crap,* that somehow the

23    Judge is going to hold that against me.  He is not.  So, the

24    floor is yours, sir.

25            THE DEFENDANT:  Um ... I think I would like to talk

1    about the difference between my criminal history before, it

2    doesn't really reflect too well in the PSI, the way its laid

3    out.  However, all of those financial crimes, the checks,

4    identity theft, all of that was one thing.  I got myself in a

5    financial situation, to where I lost my place to live, lost my

6    vehicle and had an opportunity to where an individual was

7    showing me how to create checks, create paper IDs, and I went

8    out and that was all -- all of those felonies happened within

9    a -- about a year-and-a-half spree, that I went out and used

10    that to basically survive, and be able to get me a stable place

11    to stay, things along those lines, and I knew exactly what I

12    was doing.  At that point in time, I knew I was breaking the

13    law, I anticipated if I got caught I knew what the consequences

14    were, everything along those lines.

15          In this instance, I looked at this as loans to

16    possibly be able to get business ideas off the ground and be

17    able to support myself.  Since I didn't have other means.  Yes,

18    I applied for disability.  I have been denied twice, and I just

19    again applied again, and if I'm denied this time, I'm going to

20    try to get an attorney that will help me try to get that, but I

21    figured as long as these loans were paid back, there wasn't an

22    issue with those.

23          I had, after, I believe, one or two fundings, I don't

24    remember exactly when, I had an idea of what was going on, as

25    far as the penalties, as far as the fact that these weren't

1    just typical loans, because there was different things on T.V.,

2    different things on -- different avenues that I found out, hey,

3    what I'm doing is -- it's not a regular loan.  It's far from

4    that.  And so my intentions weren't to -- weren't the same as

5    when I was breaking the law before, and that criminal history.

6         Does that change what I did?  Does it change the

7    effect it had?  Does it change the legality?  No.  And I

8    understand that.  I take full responsibility for these loans,

9    and what I have done.

10         I have experienced -- excuse me -- I have experienced

11   some medical issues since ... well, a lot of it started right

12   before my release from the department of corrections, getting

13   them to look into things wasn't the best, but I have gotten

14   into medical care now to where we're getting things resolved

15   and hopefully getting treatment to where I can have a little

16   bit more sustainability or be a little bit more stable, as far

17   as my -- my health goes.

18         But looking forward, regardless of what the sentence

19   may be, once I am out on supervised release, my plan is to

20   focus on getting disability so I have some type of income

21   coming in, which opens doors for housing and different things

22   along those lines, once that type of stuff is approved and try

23   to get myself stable.

24         I think a lot of this has stemmed from the fact that I

25   don't have stability.  I haven't been able to work since 2010,

1   and so it's made things very difficult for me.  I have been

2   able to, kind of, make some money, every now and then, by being

3   able to help other people out, as far as computer stuff and

4   things like that, but for the most part I have been completely

5   without a job or income since 2010, and that makes things very

6   difficult.

7          If I don't have family or friends that will assist me,

8   then I'm basically on my own to try to figure it out, and that

9   doesn't negate what I did; doesn't say that it's okay for me

10  to.  I think, like Ms. Butterton said, doesn't say why, give a

11  good reason, but I think in the future, once I get the approval

12  from the disability and things along those lines, and things

13  start to smooth out, I will be in a much better situation, and

14  not looking at what is out there for me to be able to generate

15  income or some type of funds to be able to survive in my

16  situation, and that's my goal, is to do it, to find a way to do

17  it in the correct manner, and I have taken steps, I have got --

18  it's being reviewed now.  My ... I don't remember, third or

19  fourth application, now, for disability.  I do have my doctors

20  now that said they would back me up, my pulmonologist and

21  primary-care doctor for disability.

22          *THE COURT:*  Your pulmonologist isn't even close.  Mind

23  you, I'm not trying to comment on disability or whether you get

24  or don't get it, but ultimately a chronic cough and shortness

25  of breath, may or may not be indicative of something, but I'm

 1  not unfamiliar with chronic cough.  Ultimately, it comes from

 2  one of -- well, one of three things, a serious lung issue,

 3  which it could be, or stuff dripping down and irritating the

 4  back of your throat or stuff coming up and irritating the back

 5  of your throat, and the two medications you have been

 6  prescribed; Flonase, is to stop the stuff from down into your

 7  throat, and the other medication is, essentially, the same,

 8  like Prilosec, to stop the stuff from going up in your throat.

 9          Obviously, I don't have an interest in trying to keep

10  you from qualifying.  I'm just saying, the fact that you are

11  seeing a pulmonologist doesn't mean that's going to be a big

12  chip on your side.  We will see -- you will see what ends up

13  happening there, but I have looked at the health aspects as

14  much as I have looked at everything else here, and just wanted

15  you to be aware of the fact.

16          Now, I'm not minimizing it.  The leg issue, the chair

17  issue, the weight issue, the heart issues, all of those are

18  real.  I'm not saying chronic cough is not real either, but

19  doesn't necessarily mean that there's an underlying serious

20  condition.  It might, but it also might not, and I am sorry I

21  interrupted you.

22          *THE DEFENDANT:*  No problem, and I understand that.

23  That's what we've talked about, and are trying to figure out,

24  with different drugs and/or medications, and different -- I got

25  the CPAP now, things like that, that are now trying to help

1    those type of situations, and then also we're doing some type

2    of scan or something on my lungs.

3            The last scan they got there was a thickening of the

4    bronchial walls, so we're going to do another test that will

5    get a better picture, but, um; that being said, that was all

6    put in -- into documentation that Ms. Butterton put about and

7    the letters from the doctors.

8            But I just -- I want to let the Court know that I had

9    a completely different intention from this situation here, and

10   the episodes that happened in my last criminal history, that is

11   showing in the PSI, all of those felonies and misdemeanors for

12   identity theft, all of those, those all came in one stream.

13   Yes, they were in different counties, we had sentencings at

14   different times because of transports between county jails and

15   prisons, things like that.  So they did get stretched out, but

16   they were all filed within about a three- to six-month period

17   of each other, once they found out who I was, and everything

18   along those lines, because the incidents happened all at once.

19   So, it wasn't like I went and did this and then oh, I decided

20   I'm going to do that later, and I got like 12 different

21   felonies out of each other.  I was sentenced to prison pretty

22   much, on all of those cases, at one time.  They were all

23   concurrent sentences, that I did.

24           And the Court knows that the time is -- is difficult.

25   I guess, mine it's ... it is ... I just wasn't intending to do

```
 1   something that was going to put me back in an incarceration
 2   situation, in the beginning, and most -- a lot of these loans
 3   that were applied for and things like that, weren't even
 4   intended to go to me.  They were intended for the individuals
 5   that they were applied for.  Yes, some of them were for me,
 6   Quantum Boost Technologies, ECS Consulting, things like that,
 7   were mine, were going to bank accounts for me, but a lot of
 8   these loans that were applied for, were not even going to bank
 9   accounts in my name.  They were going to those individuals'
10   accounts, or would go to those individuals' accounts, if they
11   were approved.  And.
12           I just intend to -- once everything is said and done,
13   and I am on some type of supervision, I just intend to try to
14   get things straight, and hopefully, fairly quickly, I can get
15   some type of income coming in, hopefully from disability or
16   whatever the case may be, to where I'm not in a situation where
17   I am desperate for a solution and that's all I got to say.
18           THE COURT:  All right.  There is one other issue that
19   I did not raise, that I just want to raise, and I suppose I'm
20   directing it at you, Ms. Butterton, although, why don't you
21   just stay there, because I suspect you are going to want to
22   talk to your client.
23           You are asking me to recommend a medical facility,
24   and that's fine.  I don't have any quarrel with that
25   recommendation.  You know, I don't know that Mr. Foreman knows,
```

1    but, you know, there ain't no such thing in Colorado.  So,

2    we're talking about, I don't know where, Minnesota, Dallas,

3    somewhere like that.  So how does he get there?

4         MS. BUTTERTON:  So, I don't need to talk to him,

5    because we have spoken about this.

6         THE COURT:  Fair enough.

7         MS. BUTTERTON:  So, you know, there are medical

8    facilities sort of all over, Springfield, Butner --

9         THE COURT:  But it's not Colorado, is the point.

10         MS. BUTTERTON:  And we discussed that at length.  I

11    think that he would get there by either having a family member

12    drive him.  He has a wheelchair-compatible vehicle.  There's a

13    lift, right, it's my understanding.  So, he can get there, is

14    what I'm saying.  Or he can fly although, you know, this is a

15    complete non sequitur, I think people in wheelchairs have a

16    very difficult time flying because Airlines break wheelchairs

17    all the time.

18         Anybody is interested, email me, I will send you a

19    great article about it.  It's terrible how often Airlines break

20    wheelchairs.  So, we were talking about --

21         THE COURT:  Any other industry you want to trash,

22    while you are here today?

23         MS. BUTTERTON:  I have got a lot.  I think he can get

24    there.  I think, you know, if he gets to Butner, well, that's a

25    drive, but he does have some family in the area, and he -- I

1    feel very firmly that he could get to one of these facilities.

2         Also, I guess, you know, buy a ticket on Frontier for

3    $3, pay a million dollars when you get to the gate, and he

4    could -- they have to accommodate people with disability, and I

5    think they would do that.  Is that the best idea in the world?

6    I don't know.  We will see how it shakes out, but I think he

7    can get there.

8         *THE COURT:*  All right.  In fashioning a sentence here

9    today I have considered the Presentence Report, all matters

10   that have been filed by the parties related to that report.  I

11   have considered, independently, of the parties, all matters in

12   that report.  I have considered the statements, arguments of

13   counsel here today.  I have considered the additional matters

14   filed in connection with sentencing.

15        I'm mindful of the fact that I'm required, by law, to

16   impose a sentence which is sufficient, but not greater than

17   necessary, to achieve the purposes of sentencing.

18        In fashioning that sentence I have considered, both

19   individually and as a whole, all of the 3553 factors which must

20   be considered.

21        Mr. Foreman, what I do is I tell you what it is I'm

22   going to do.  I think apart from the issue of the time, I have

23   already told you, essentially, that there are two counts of

24   conviction and so as a consequence of that, I have to impose

25   $200 in special assessments, which, is fancy way of saying

1    court costs, although it doesn't go to the court, it goes to a

2    victim fund.

3            In terms of supervised release, I'm going to give you

4    supervised release that has been ... recommended, and again, to

5    be clear, that is three years on each count, but all terms of

6    supervised release run together.

7            I'm not going to give you a fine.  I am going to order

8    forfeiture of those items reflected in the preliminary order of

9    forfeiture, and I say that because, as I noted, it includes an

10   additional item.  I'm also going to order that Mr. Foreman

11   receive a credit in the amount of $38,032.95, against the money

12   judgment of $367,552, that credit that I have spoken of, is the

13   sum of all of the matters reflected in the Plea Agreement, and

14   the additional amount that shows up in the preliminary order of

15   forfeiture.

16           I am going to order restitution in the amount of

17   367,552 going to the Small Business Administration, at the

18   address listed in the Presentences Report.

19           With respect to the restitution, I am going to order

20   that the sum of $151,000 be joint and several with

21   Chandler Simbeck, who I understand has reappeared or been found

22   or whatever the case may be, but that he is set to continue his

23   case in this court, and I will find out what the details of

24   that are later.

25           This number is, although I have not discussed it with

1    counsel, based on my analysis of the chart, at paragraph 50 of

2    the Presentence Report, where I note that $151,000 in funds

3    went to Simbeck, and that's where that number comes from.  And

4    then what's left are the terms of conditions of supervision.  I

5    have already described that.  At least in terms of what I'm not

6    going to do, and as I go through the pronouncement, if I

7    stumble and start to give something that I said I was not going

8    to do, I don't need either counsel being polite, just stop me.

9          Then, what it comes down to then, is what's the amount

10   of time?  And let's just be clear, I'm not giving you 30

11   months.  I -- I'm just not doing it.  I wouldn't do it if it

12   was 24 to 30.  I understand what you are say, and you do have a

13   much easier to visualize connection between difficulties,

14   physical, and the need to survive.  I get that.

15         That being said, to be as direct about it as possible,

16   this turned into you grabbing as much money as they would give

17   you.  The notion that you were going to pay it back, I do not

18   believe; and the notion that this was to start some business, I

19   consider to be balderdash; that being said, I also, generally,

20   take the position that the people that keep doing the same

21   thing, I'm not going to keep giving them lesser and/or equal

22   sentences.  I'm going to up the penalty.  But what I'm going to

23   give you is 66 months, and say that I understand, given the

24   guideline range that I found I could give 78 months with no

25   explanation and just be quiet and move on.  I also understand

```
 1   full well, that I'm in the matter that's, I suppose, outside of
 2   the agreed upon in the Plea Agreement with regard to what you
 3   can or can't do in terms of appeals.  I really don't care about
 4   that one whit.  If what I have done here today is wrong,
 5   Circuit says so, then it's wrong.  I mean, there's not a whole
 6   lot to talk about there.  But I am, within the range that I
 7   have found, going towards the lower end of that range.  Because
 8   of these things that you have mentioned, the difficulties with
 9   surviving, as well as the fact that you do have medical issues
10   that will complicate things.  I will also say, those medical
11   issues, the wheelchair, the difficulties going around, all of
12   that was part and parcel of the experience you had in the DOC,
13   and as I said before, you came out and three months later
14   you're committing a similar-type of crime, which you see as
15   different, and I don't, it's as simple as that.
16           So, that's it.  Government?
17           MR. BROWN:  Nothing further, Your Honor.
18           THE COURT:  Ms. Butterton?
19           MS. BUTTERTON:  Is now the appropriate time to talk
20   about self-surrender or do you want to wait --
21           THE COURT:  I will tell you what I'm going to do in
22   terms of self-surrender, you can tell me whether or not you
23   want something different.  I am ... going to order that
24   Mr. Foreman report, by noon, on September 12 of this year, to
25   the institution designated by the BOP -- excuse me -- yes, by
```

1   the BOP.

2          Alternatively, in the event that no designation has

3   been made by that date, or in the event that he is unable to

4   get to said facility, for reasons of travel, funding, whatever,

5   that he report to the U.S. Marshal Service in this building on

6   the third floor by said date.

7          And I will be, again, transparent, in saying to you,

8   I'm aware he has got a lot of medical things going on and on

9   and on.  I'm not going to keep pushing that date.  I'm not

10  inclined to push it once, but I'm not going to foreclose being

11  told something that I haven't thought of.

12          *MS. BUTTERTON:*  Thank you, Your Honor.  We had

13  requested -- the Court is very thorough, I'm sure you read

14  this, we requested that we set this out for 90 days.  We

15  provided a doctor's note, a doctor who is caring for

16  Mr. Foreman, and that is Exhibit... let me just make sure I'm

17  directing you to the right thing ...

18          *THE COURT:*  I just had it in front of me and I moved

19  it, but go ahead.

20          *MS. BUTTERTON:*  I'm just finding it here.  There's one

21  that's to the addendum, but the one that I'm referring to is

22  Exhibit A, to **Document 55**, by Megan I'm sure --

23          *THE COURT:*  Hold on, hold on.  I'm there.  Just got to

24  scroll through.  Yeah.  She is a, quote/unquote, provider,

25  whatever that means, and it basically says that, yeah, they are

1    trialing empiric therapies, and what I'm telling you is I'm not

2    waiting 90 days for something that has been pending for at

3    least since May of last year.  I'm giving you these 30 and

4    that's it.

5        *MS. BUTTERTON:*  Going back to the earlier reference

6    about hard pills to swallow and tenacity, would the Court

7    consider going out 60 days, to October?  Here is why I say

8    that, I understand where the Court is at.  Typically and

9    listen --

10       *THE COURT:*  Okay.  Let's put all of our cards on the

11   table.  What I'm concerned about is I'm going to get a bunch

12   of -- a daisy chain of, *I have got to get that test that came*

13   *back this way, oh I have got to get that test, oh that came*

14   *back that, oh my god, oh my goodness*, and this thing never

15   stops or it gets pushed out into, I don't know, some time in

16   which I'm even older and grayer than Mr. Brown thinks I am now;

17   that's what I'm concerned about.

18       Some of these tests I look at and I say, *He has*

19   *legitimate concerns*.  I'm also recommending that he go to a

20   medical facility.  I'm not going to wait until he formulates

21   some, I don't know what, chart of *Here's what I need, Judge*,

22   *now.  Oh my goodness, send me somewhere else*.  No, no, no.  He

23   has done the crime, he is going to do the time, and it's going

24   to be done sooner rather than later.

25       *MS. BUTTERTON:*  I understand.  My request would be so

1   much more eloquent than how you described.

2            THE COURT:  Absolutely.

3            MS. BUTTERTON:  And also, I am requesting that the

4   Court pull a Solomon and split the baby, and give him until

5   October; that's my request, and just so the record is clear,

6   obviously, I'm asking for 90 days.  We asked for --

7            THE COURT:  September 30.

8            MS. BUTTERTON:  Thank you.

9            THE COURT:  And just to be clear, it's either -- by

10  then there will be a designation.  I have no doubt about that,

11  because it takes about -- 14, 21 days, something along that

12  line?

13           MS. BUTTERTON:  Depends how quickly the Court enters

14  judgment.

15           THE COURT:  Have you ever known me to be slow with

16  judgments?

17           MS. BUTTERTON:  Well, I'm just saying that there are a

18  lot of factors.

19           THE COURT:  Absolutely.  Okay.  And certainly I will

20  enter this judgment quickly.

21           All right.  We have been around some additional

22  things, let come back to you, Mr. Brown, anything?

23           MR. BROWN:  No, Your Honor.

24           THE COURT:  Ms. Butterton, anything else?

25           MS. BUTTERTON:  I don't think so.

1          *THE COURT:*  Okay.  In case I slip, and don't pick up

2    something, again, the rule is just interrupt me, in the moment;

3    don't wait until I get too far back, and let me see if I can

4    get this all done the way that I have indicated.

5          All right.  I have determined the guideline range.  I

6    find that there's no reason to depart or vary from that

7    guideline range.  The difference between the maximum and

8    minimum of the range does not exceed 24 months, which means

9    that I'm not required to provide an explanation, but I have

10   already done so.

11         In terms of what my reasoning is, with respect to

12   trying to balance Mr. Simbeck's (sic) medical concerns with

13   what I consider to be a significant and serious offense.

14         Pursuant to the Sentencing Reform Act of 1984, it is

15   the judgment of the Court that the defendant, Russel Foreman is

16   hereby committed to the custody of the BOP to be imprisoned for

17   a term of 66 months, on each of Counts 5 and 9.  The 66-month

18   term is to be served concurrently, for a total term of 66

19   months.

20         Upon release from imprisonment, the defendant shall be

21   placed on supervised release for a term of three years; that's

22   a three-year term on each -- on each of Counts 5 and 9.  Both

23   such terms to run concurrently with each other.

24         Within 72 hours of release from the custody of the

25   Bureau of Prisons, the defendant shall report in person to the

1    probation office in the district to which he is released.

2    While on supervision you must not commit another federal, state

3    or local crime.  You must not unlawfully possess a controlled

4    substance.  You must refrain from any unlawful use of a

5    controlled substance.  You must submit to one drug test within

6    15 days of release from imprisonment and a maximum of 20 tests

7    per year of supervision, thereafter.

8         You must make restitution in accordance with

9    applicable statutes.  You must cooperate in the collection of

10   DNA as directed by the probation officer.

11        In addition to these mandatory conditions, you must

12   comply with all standard conditions adopted by this Court in

13   General Order 2020-20.

14        There are also special conditions that I find that are

15   appropriate, and that do not involve a greater depravation of

16   liberty, than reasonably necessary, to accomplish the goals of

17   sentencing.

18        The special conditions are these:  One, you must

19   participate in a program of cognitive-behavioral treatment

20   approved by the probation officer and follow the rules and

21   regulations of such program.  The probation officer, in

22   consultation with the treatment provider, will supervise your

23   participation in the program, as to modality, duration and

24   intensity.  You must pay for the costs of treatment, based on

25   your ability to pay.

1    Two, as the judgment imposes a financial penalty, that

2   is restitution, you must pay the financial penalties in

3   accordance with the schedule of payments sheet which will be a

4   part of the judgment.  You must also notify the Court of any

5   changes in economic circumstances that might affect your

6   ability to pay.

7    Three, you must not incur new credit charges or open

8   additional lines of credit, without the approval of the

9   probation officer, unless you are in compliance with the

10  periodic-payment obligations imposed pursuant to the Court's

11  judgment and sentence.

12   Four, you must provide the probation officer access to

13  any requested financial information, and authorize the release

14  of any financial information, until all financial obligations

15  imposed by the Court are paid in full.

16   Five, you must apply any moneys received from income

17  tax refunds, lottery winning, inheritances judgments and any

18  anticipated or unexpected financial gains to the outstanding

19  Court-ordered financial obligations in this case.

20   Six, the probation office may share any financial or

21  employment documentation relevant to you with the Asset

22  Recovery Division of the United States Attorney's Office to

23  assist in the collection of the obligation.

24   Next, any business you operate during the term of

25  supervision, must be approved by the probation officer.  You

 1   must operate under a formal registered entity and must provide

 2   the probation officer with the name of the business entity and

 3   its registered agents.  You must maintain business records and

 4   provide all business documentation and records as requested by

 5   the probation officer.

 6           Next, you must not cause or induce others to register

 7   a business entity on your behalf.

 8           Next, you must document all income and compensation

 9   generated or received from any source and must provide that

10   information to the probation officer, as requested.

11           Next, you must not cause or induce anyone to conduct

12   any financial transaction on your behalf, or maintain funds on

13   your behalf.

14           Next, you must not conduct any foreign financial

15   transactions, without the advanced approval of the probation

16   officer, and I believe that is the end of the special

17   conditions.

18           You must make restitution in the amount of $367,552 to

19   the Small Business Administration as set forth in the

20   Presentence Investigation Report.  With respect to said total

21   amount of restitution, a portion thereof, specifically the sum

22   of $151,000 is joint and several with any restitution

23   obligation entered, with respect to the codefendant in this

24   case, Chandler Simbeck.

25           You must pay a Special Assessment of $200, which is

 1    due and payable, immediately.  The defendant does not have

 2    ability to pay a fine, so I waive the imposition of a fine in

 3    this case.  The special assessment and restitution obligations

 4    are due, immediately.

 5          Any unpaid monetary obligations, upon release from

 6    incarceration, shall be paid in monthly installments during the

 7    term of supervised release.  The monthly installment payment

 8    will be, initially, calculated as at least 10 percent of the

 9    defendant's gross monthly income.

10          That being said, let me just say to Mr. Simbeck (sic)

11    and to counsel --

12          *MS. BUTTERTON:*  Mr. Foreman, Your Honor.

13          *THE COURT:*  Mr. Foreman and counsel, that, obviously,

14    if the only source of income is disability, I'm open to a

15    motion -- motion to modify.  We will see what that is, but I

16    can't deal with that now, because I don't know what it will be.

17    So, for now, the monthly installment payment is at least 10

18    percent of the defendant's gross monthly income.

19          Pursuant to Rule 32.2 of the Federal Rules of Criminal

20    Procedures, you must forfeit your interest in that property

21    listed in the Preliminary Order for Forfeiture for specific

22    assets and a personal money judgment that includes the one,

23    two, three, four, five, six, six specific items seized from

24    bank accounts and FanDuel accounts and Ameritrade accounts that

25    are listed on page two of the Preliminary Order Of Forfeiture,

```
 1   at A through F.  It also includes, separate and apart from

 2   that, a money judgment in the amount of $367,552 even.

 3         With respect to the money judgment, the defendant

 4   shall receive credit against the money judgment in the amount

 5   of $38,032.95, three, eight, comma, zero, three, two, point

 6   nine five.  Said amount constituting the sum of the other

 7   forfeited items, and to the extent that additional items are

 8   forfeited in the future, he shall receive credit against the

 9   money judgment for those items, as well.

10         I do recommend to the Bureau of Prisons that the

11   defendant be designated to a medical facility, in light of his

12   documented medical difficulties and conditions.

13         The defendant advised of his right to appeal the

14   sentence, if he desires to appeal, a Notice of Appeal must be

15   filed with the Clerk of the Court within 14 days after entry of

16   judgment or the right to appeal will be lost.  If the defendant

17   is unable to afford an attorney for an appeal, the Court will

18   appoint one to represent him.  If the defendant so requests,

19   the Clerk of the Court must immediately prepare and file a

20   Notice of Appeal on his behalf.

21         I am aware of the fact that I have just advised you of

22   the right to appeal.  I'm also advising you that your Plea

23   Agreement with the government, contained a limited waiver of

24   appeal that may or may not be applicable in this circumstance,

25   and that is of little interest to me, personally.  I refer you
```

1   to Ms. Butterton and she can discuss the -- how those two

2   matters interact.

3          In terms bond, Mr. Foreman is on bond, and has been

4   compliant with all bond conditions, up to now.  His bond is

5   continued in this matter, and he is ordered to report on or

6   before noon on September 30, to the institution designated by

7   the Bureau of Prisons for service of his sentence.

8          In the alternative or in the event no such institution

9   has yet been designated, then he shall surrender to the U.S.

10   Marshal's service on the fifth floor of this building, the Araj

11   Courthouse, and they will arrange for his transportation and

12   delivery to the then designated or to be designated

13   institution.

14          MS. BUTTERTON:  Your Honor?

15          THE COURT:  Yes.

16          MS. BUTTERTON:  Is that in the alternative, just if he

17   is not designated or also?

18          THE COURT:  In the alternative; one, that he has not

19   designated; or two, he chooses to surrender here, as opposed to

20   undertake the travel to wherever he may be designated to.  It's

21   simply the case that I don't know about his mobility or ability

22   to travel commercially or by vehicle; whether he can get

23   someone to do it or not.  I'm giving up the option.  If there

24   is a designation, he can surrender at the designated place or

25   in the alternative, here, and if there is not a designation,

1    then he shall surrender here --

2           *MS. BUTTERTON:*  Got it, thank you.

3           *THE COURT:*  -- on or before noon on September 30.

4           In connection with that order, I direct that the

5    probation department advise Jillian Fleck, of the United States

6    Marshal's Service, of when a designation has been made, and

7    whether or not... at least no later than by Monday of the --

8    well ... no later than September 26th, which is the Monday of

9    the week of surrender.  Update her as to the status of

10   designation or non-designation, so that she can, if need be,

11   make arrangements, and I suppose I will end with saying, the

12   mystery man that has been in the courtroom and has now left was

13   someone from the Marshals service.  I know he was recognized by

14   Ms. Butterton.  The simple reason is I asked him to put eyes on

15   Mr. Foreman so that -- so that the Marshal Service would be

16   aware of needs and transport difficulties, in the event that he

17   surrenders here.

18          I'm done.  Anything further on behalf of the

19   government?

20          *MR. BROWN:*  No, Your Honor.

21          *THE COURT:*  Ms. Butterton, sorry?

22          *MS. BUTTERTON:*  No, Your Honor.  Thank you.

23          *THE COURT:*  Recess.

24          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

25       (Recess at 3:58 p.m.)

1                        REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

4

5        Dated at Denver, Colorado, this 19th day of September,

6    2022.

7                            s/Tammy Hoffschildt

8                          _____

9                          Tammy Hoffschildt, FCRR,RMR,CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25